■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANONYMOUS, Appellant. [712 NYS2d 482] —Judgment, Supreme Court, New York County (Allen Alpert, J.), rendered October 16, 1996, convicting defendant, after a jury trial, of robbery in the first degree (two counts) and robbery in the second degree, and sentencing him to two consecutive terms of 12½ to 25 years to run concurrently with a term of 7½ to 15 years, affirmed.

Defendant was convicted of participating in two gunpoint robberies. The first occurred on November 22, 1995 at a Martin Paints store on 181st Street in Manhattan. According to the victims of the robbery, defendant and an accomplice, Carl Dade, armed with guns, entered the store and announced a robbery. Defendant's accomplice held a gun to the back of one of the

victims, Nathan Rivera, and commanded him and another victim, Elsy Alvarado, to open the cash register. After that, Rivera and Alvarado were ordered to the back of the store, where defendant had forced yet another victim, Anibal Losado, to lie on the floor at gunpoint.

Unsatisfied with the money found in the register, defendant ordered Alvarado and Losado to go to the basement while defendant's accomplice forced Rivera to provide the keys to a box containing more money. Around this time, Rivera was able to clearly see defendant's face, which was well lit by the store's interior lighting. Unfortunately, despite Rivera's acquiescence to the commands of his assailants, defendant's accomplice kicked Rivera down the basement stairs, requiring him to be removed by ambulance after the robbery was completed.

Ten days later, on December 3, 1995, defendant participated in a second robbery, this time at the Martin Paints store on 125th Street, once again accompanied by his accomplice, Carl Dade. During this robbery, a salesman, Fred Crosby, observed defendant and Dade enter the store and asked them on more than one occasion if they needed assistance to which they responded that they did not. Moments later, defendant burst into the office at the back of the store, where the store manager was getting coins from the safe for the store's registers. Complying with defendant's demand, the manager filled a bag with approximately $8,000, at which point defendant exited the office. At this juncture, Crosby, apparently unaware that a robbery had just taken place, observed defendant and asked him if he needed assistance. Defendant responded that he did not and left the store. Although the police arrived shortly thereafter, defendant and Dade had already absconded.

A police investigation followed and, on the morning of January 2, 1996, Detective Michael Kennedy was notified that defendant had been arrested for the robbery of a Martin Paints store in Queens. Although the arrest was voided for reasons that are not entirely clear, Detective Kennedy spoke to defendant, who told him that he did not want the robbery "pinned" on him. Defendant also told Kennedy that he had information that he could provide regarding an unrelated homicide.

With this information in hand, Detective Kennedy devised a plan in which he would tell defendant to come to the stationhouse to talk about the homicide. Defendant subsequently agreed. During the interview that followed, defendant was asked about the robberies of the Martin Paints stores. Recognizing that his participation in the robberies was close to being detected, defendant sought to extricate himself, admit-

ting that he knew the robbers but denying that he was a participant. Information obtained from defendant led to the arrest of his accomplice, Carl Dade, as well as another man.

Thereafter, Rivera, who was a victim in the November robbery, and Crosby, who was a witness in the December robbery, identified defendant in separate lineups as the perpetrator of the respective robberies. Later, at trial, Rivera and Crosby again identified defendant as the perpetrator.

In addressing the various errors defendant claims warrant a vacatur of his conviction, we initially note that the evidence against defendant was overwhelming and, notwithstanding the dissent's contention to the contrary, it strains all bounds of credulity to believe that any of the assigned errors could have affected the verdict. As noted, defendant was unequivocally identified by witnesses to each of the two robberies. Defendant also admitted that he knew the perpetrators, although he concocted a story in which he sought to extricate himself from any involvement. We simply cannot ascribe the convergence of this evidence to coincidental misfortune.

Turning to the specific errors pointed to by defendant, the court properly exercised its discretion in permitting the People to cross-examine defendant's main alibi witness concerning her fear of defendant (*see, People v Thomas*, 46 NY2d 100, 105, *appeal dismissed* 444 US 891) and in permitting rebuttal testimony to challenge the witness's testimony (*see, People v Harris*, 57 NY2d 335, 345, *cert denied* 460 US 1047). The witness's statements to the police, in which she indicated, *inter alia*, that she was "terrified" of defendant, provided a good-faith basis for the cross-examination. The evidence permitted a reasonable, non-speculative inference that the witness's fear of defendant supplied a motive to furnish a false alibi (*see, People v Rodriguez*, 143 AD2d 854, *lv denied* 73 NY2d 859; *People v Castrechino*, 134 AD2d 877, *lv denied* 70 NY2d 1005; *see also, People v Folk*, 176 AD2d 754, *lv denied* 79 NY2d 947). To the extent that this evidence suggested involvement by defendant in uncharged crimes, it was more probative than prejudicial. Since the rebuttal evidence related to specific bias rather than general credibility, it was not collateral (*see, People v Chin*, 67 NY2d 22, 28-29).

Next, by failing to object, failing to make specific objections, or by failing to request further relief after objections were sustained, defendant failed to preserve his various challenges to the People's summation and, contrary to the dissent's contention, there is nothing in this record warranting consideration of his claims in the interest of justice. Were we to review these

claims, we would find that the challenged comments were largely responsive to issues raised by the defense and did not deprive defendant of a fair trial (*see, People v Overlee*, 236 AD2d 133, *lv denied* 91 NY2d 976; *People v D'Alessandro*, 184 AD2d 114, 118-119, *lv denied* 81 NY2d 884).

As to defendant's challenge to the court's reasonable doubt charge, it was not preserved (*see, People v Thomas*, 50 NY2d 467), and we decline to review this unpreserved claim in the interest of justice. Were we to review this claim, we would find that the charge as a whole conveyed the proper standards (*see, People v Cubino*, 88 NY2d 998).

Finally, in view of the nature of the crimes charged, we perceive no abuse of sentencing discretion. Concur—Williams, Mazzarelli, Rubin and Friedman, JJ.

Rosenberger, J. P., dissents in a memorandum as follows: I would reverse and remand for a new trial on the sole ground of the prosecutor's inflammatory and misleading statements on summation (*see, People v Ashwal*, 39 NY2d 105, 110). Even when there is strong evidence of a defendant's guilt, reversal is warranted when the cumulative effect of erroneous and prejudicial statements by the prosecutor denied the defendant a fair trial (*People v Ortiz*, 116 AD2d 531; *People v Rosa*, 108 AD2d 531, 539; *People v Dowdell*, 88 AD2d 239, 248; *People v Cancel*, 61 AD2d 497, 498). "The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" (*People v Crimmins*, 36 NY2d 230, 238). This Court has often repeated that clear holding. Indeed, in *People v Dowdell* (*supra*, at 239-240), the second sentence of the opinion is: "In this case, appellant's guilt was established by overwhelming evidence, and if this case had been tried without the numerous errors, hereinafter discussed, appellant's conviction would have been readily affirmed."

Defendant was charged with armed robbery of two Martin Paints stores. On summation, the prosecutor improperly suggested that Anthony McNeil, a store employee who witnessed the second robbery, did not testify because he was afraid of defendant: "Did it really shock anybody that Anthony McNeil refused to be found, McNeil refused to cooperate? This is New York City. Anybody believe when I come into the office at a quarter to eight there's a line outside, people saying pick me, can I be a witness to a robbery, can I face the man who had a gun, can I do that and put my life in jeopardy." Not only was there no evidence that McNeil had ever been threatened or expressed fear for his safety, but the prosecutor knew this was not the real reason McNeil did not testify. In a pretrial col-

loquy the week before his summation, the prosecutor told the court that the People had *chosen* not to call McNeil as a witness because McNeil was not able to identify the perpetrators. Since defendant allegedly approached McNeil from behind, the latter never had the opportunity to see his face during the robbery.

The false insinuation that defendant had intimidated McNeil was especially prejudicial in light of the prosecutor's previous impeachment of defendant's alibi witness, Jacqueline Charles. On cross-examination, he asked Charles if she had ever told detectives that she was only testifying on defendant's behalf because she was afraid of what he would do to her if she refused. When Charles denied it, the People called the detectives to testify that she had indeed told them that she feared defendant. In this context, the prosecutor's meretricious explanation for McNeil's absence served to portray defendant as a dangerous, violent person who had a propensity to intimidate witnesses.

A prosecutor may not "try to convey to the jury, by insinuation, suggestion or speculation, the impression that the defendant is guilty of other crimes not in issue at the trial" (*People v Ashwal, supra,* at 110 [reversing conviction where prosecutor in summation made a baseless suggestion that informant was not present as a witness because defendant had him killed]; *People v Norton,* 164 AD2d 343, 356, *affd* 79 NY2d 808 [reversible error for prosecutor to state, without any evidence, that complainant's recantation was based on threats from defendant]). Here, since the reason for McNeil's absence was irrelevant to the case, the prosecutor's explanation was probative of nothing but defendant's alleged criminal propensity and bad character (*see, People v Schwartzman,* 24 NY2d 241, 247, *cert denied* 396 US 846). Moreover, the fact that the court may have sustained defense counsel's objection is not always sufficient to dispel the prejudice when there is a pattern of improper remarks by the prosecutor (*see, People v Coates,* 137 AD2d 192, 200-201, *affd* 74 NY2d 244).

Nor was this the prosecutor's only prejudicial misstatement. Pursuant to the trial court's *Sandoval* ruling, the prosecutor was allowed to inquire into the underlying facts of a number of defendant's past convictions. All of his convictions were misdemeanors or youthful offender adjudications and none involved weapons or violence against another person. To attempt to explain or minimize this record, and also to show how the instant offense was not consistent with his profile, defendant testified that he had only become involved in these crimes in

connection with his undercover work as a confidential informant and therefore had been given favorable plea bargains. The People contend that this testimony opened the door to the following remarks on summation:

"Here is a career criminal who has lived his entire life engaged in petit [sic] crimes. I suggest he has lived his entire life breaking the law. Here is a man before you who breaks the law with the same regularity that some people brush their teeth * * *

"I ask you, I implore you now, after your deliberations to say wrong, [defendant] it stops here. [Defendant], you can no longer plea bargain away every single thing you have done. You can no longer sell information and get out from under. You can no longer not answer for your actions. Once finally, and now here today you have to say to [defendant] stop. Stop it * * *

"Finally after all these years someone said no, [defendant], go to trial. No plea bargain. You're not going to get one in this case."

An objection to the final remark was sustained.

These remarks are flawed in several ways. First, there was no evidence that defendant had sought a plea bargain and been turned down, as opposed to choosing freely to exercise his right to a trial. Second, the prosecutor essentially encouraged the jury to find defendant guilty not solely on the basis of the evidence at trial, but also because he had allegedly received insufficient punishment for his so-called "one man crime spree" in the past (see, People v Cancel, supra, at 499 [misrepresenting defendant's record]; People v Clemons, 166 AD2d 363, 366 [prosecutor exceeded bounds of Sandoval ruling and appealed to jury's prejudices]).

It is improper for a prosecutor to use inflammatory language which appeals to the jury's sympathies and fears (People v Ortiz, supra, at 532). In this case, the prosecutor exploited the jury's fears that career criminals were abusing the criminal justice system through lenient plea bargains. These comments exceeded the bounds of propriety, repeatedly surging outside the evidence (see, e.g., People v Fogel, 97 AD2d 445, 446 [reversible error for prosecutor to tell jury, " 'The only way to stop Hedda Fogel is at this time for you, the members of the jury, to find her guilty of the two charges before you' "]). The hyperbolic references to defendant's record went beyond any legitimate purpose and "unquestionably had a significant tendency to persuade the jury to consider the defendant as someone with a criminal disposition" (People v Cancel, supra, at 500). There was nothing in the defense summation to which the prosecutor's improprieties were responsive.

Although defense counsel's objections were not accompanied by a request for curative instructions or for a mistrial, the impropriety of the prosecutor's behavior warrants reversal (*People v Butler*, 185 AD2d 141, 144). While not all of the comments complained of on appeal have been preserved for review, this Court should review them in the interest of justice, given the serious prejudice to defendant (*supra*, at 145).

There should be no doubt that a prosecutor, seeking a conviction at trial, has a duty to conduct himself in such a way as to assure the integrity of the trial itself and, thus, the ensuing verdict and judgment. This prosecutor failed to carry out that duty. It has long been settled that a prosecutor "is a *quasi*-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice" (*People v Fielding*, 158 NY 542, 547). "[H]is primary duty is to see that justice is done and the rights of all—defendants included—are safeguarded. There is a positive obligation on his part to see that a trial is fairly conducted" (*People v Lombard*, 4 AD2d 666, 671). We must be alert that a strong, or even "overwhelming," case not be substituted for a fair trial.